Slip Op. 11-65

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PASTIFICIO LUCIO GAROFALO, S.P.A., <br><br> Plaintiff, <br><br> – v – <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> – and – <br><br> AMERICAN ITALIAN PASTA COMPANY, DAKOTA GROWERS PASTA COMPANY, and NEW WORLD PASTA COMPANY, <br><br> Defendant-Intervenors. | Before: Pogue, Chief Judge <br><br> Consol.[1] Court No. 10-00095 <br><br> **Public version** |

<u>OPINION</u>

[Affirming Department of Commerce's final results of administrative review of antidumping duty order]

Dated: June 8, 2011

<u>Drinker Biddle & Reath LLP</u> (<u>William Silverman</u>, <u>Douglas J. Heffner</u>, and <u>Richard P. Ferrin</u>) for Plaintiff and Defendant-Intervenor Pastificio Lucio Garofalo, S.p.A.

<u>Kelley Drye & Warren LLC</u> (<u>Paul C. Rosenthal</u> and <u>David C. Smith</u>) for Plaintiffs and Defendant-Intervenors American Italian Pasta Company, Dakota Growers Pasta Company, and New World Pasta Company.

<u>Tony West</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director; <u>Reginald T. Blades, Jr.</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Jane C. Dempsey</u> and <u>Carrie A. Dunsmore</u>), and, of counsel, <u>Shana Hofstetter</u>, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, for Defendant United States.

---

[1] This action is consolidated with Court No. 10-00097.

**Pogue, Chief Judge**:  This consolidated action challenges four determinations made by the United States Department of Commerce ("Commerce" or the "Department") in the final results of the twelfth administrative review of an antidumping ("AD") duty order on pasta from Italy.[2]

Plaintiff Pastificio Lucio Garofalo, S.p.A. ("Garofalo"), a mandatory respondent in this review,[3] challenges Commerce's use of quarterly cost averaging periods in evaluating whether certain of Garofalo's home market sales were made below the cost of production, and the Department's decision to compare Garofalo's U.S. sales solely to home market sales made within the same quarterly period.

Plaintiffs American Italian Pasta Company, Dakota Growers Pasta Company, and New World Pasta Company (collectively the "Petitioner Plaintiffs"), the petitioners,[4] challenge Commerce's intention, expressed in the Final Results of this review, to employ new industry-wide model match criteria when making foreign

---

[2] See Certain Pasta from Italy, 75 Fed. Reg. 6,352 (Dep't Commerce Feb. 9, 2010) (notice of final results of the twelfth administrative review) ("Final Results") and accompanying Issues & Decision Mem., A-475-818, ARP 07-08 (Feb. 2, 2010), Admin. R. Pub. Doc. 189 ("I & D Mem."). The period of review ("POR") was July 1, 2007, through June 30, 2008. Final Results, 75 Fed. Reg. at 6,352.

[3] Final Results, 75 Fed. Reg. at 6,352.

[4] Id. at 6,352 n.2.

like product determinations in future reviews of this AD duty
order.  The Petitioner Plaintiffs also challenge the Department's
acceptance, in this review, of company-specific model match
criteria for each mandatory respondent.

The court has jurisdiction pursuant to Section 516A(a)(2) of
the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)
(2006)[5] and 28 U.S.C. § 1581(c).

As explained in detail below, the court rejects both of
Garofalo's challenges, concluding that the Department reasonably
interpreted its statutory authority to measure costs of
production and select appropriate time frames for sales
comparisons, and that the agency decisions in this regard were
supported by substantial evidence on the record of this review.

With regard to the challenges brought by the Petitioner
Plaintiffs, the court concludes that Commerce's intention to
apply new model match criteria in future administrative reviews
is not ripe for judicial review, and that Commerce's
determinations regarding the model match criteria used in this
review were based on a permissible interpretation of the statute
and supported by substantial evidence.

Accordingly, the Department's <u>Final Results</u> in this review
are affirmed.

---

[5] All further citations to the Tariff Act of 1930, as
amended, are to Title 19 of the U.S. Code, 2006 edition.

## STANDARD OF REVIEW

The court shall uphold the determinations challenged in this case unless they are found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Though reasonable minds may differ, if a reasonable mind could accept the connection presented between the facts found and the conclusion reached, an alternative judgment may not be substituted for that of the agency. FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1810 (2009) ("[A] court is not to substitute its judgment for that of the agency . . . ." (quotation marks and citation omitted)); Siderca S.A.I.C. v. United States, 29 CIT 1030, 1048, 391 F. Supp. 2d 1353, 1369 (2005) ("Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account.").

An agency acts contrary to law when it acts arbitrarily or based on an impermissible construction of its statutory authority. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) (an agency acts contrary to law if it acts based on an impermissible construction of its statutory authority); Burlington Truck Lines, Inc. v. United States, 371

U.S. 156, 167-68 (1962) (agencies act contrary to law if

decision-making is not adequately reasoned).

The court will discuss, in turn, each challenge to the

Department's determinations in this review.

### DISCUSSION

I.   Garofalo's Challenges

A.   *Cost of Production*

1.   *Background*

In order to calculate a dumping margin for the pasta at

issue here, Commerce calculates the normal value for which that

pasta is sold in Italy.[6]  In calculating normal value, the

---

[6] Goods are considered "dumped" under the AD statute when
they are sold at less than fair value ("LTFV"), 19 U.S.C.
§ 1677(34) – that is, when "the normal value exceeds the export
price or constructed export price of the subject merchandise."
19 U.S.C. § 1677(35)(A).  "Normal value" is "the price at which
the foreign like product is first sold (or, in the absence of a
sale, offered for sale) for consumption in the exporting country,
in the usual commercial quantities and in the ordinary course of
trade and, to the extent practicable, at the same level of trade
as the export price . . ., at a time reasonably corresponding to
the time of the sale used to determine the export price or
constructed export price." 19 U.S.C. § 1677b(a)(1)(A) & (B)(i).
"Export price" is "the price at which the subject merchandise is
first sold (or agreed to be sold) before the date of importation
by the producer or exporter of the subject merchandise outside of
the United States to an unaffiliated purchaser in the United
States or to an unaffiliated purchaser for exportation to the
United States, as adjusted under [19 U.S.C. § 1677a(c)]." Id. at
§ 1677a(a). Constructed export price is not applicable here.
As explained below, sales at prices below the cost of
production are excluded from the calculation of normal value as
being outside the ordinary course of trade. Id. at §§ 1677(15)(A)
& 1677b(b)(1).

Department considers only those sales in the comparison market
that were made in the "ordinary course of trade." 19 U.S.C.
§ 1677b(a)(1)(B)(i).  The "ordinary course of trade" is defined
as "the conditions and practices which, for a reasonable time
prior to the exportation of the subject merchandise, have been
normal in the trade under consideration with respect to the
merchandise of the same class or kind," id. at § 1677(15),
disregarding sales that the Department "has reasonable grounds to
believe or suspect . . . have been made at prices which represent
less than the cost of production of that product." Id. at
§ 1677b(b)(1).[7]

    Garofalo challenges the time periods used by the Department
to average Garofalo's costs of production in order to make the
requisite comparison under Section 1677b(b). (Mem. Supp. Pl.'s
Mot. for J. on Agency R. under Rule 56.2 ("Garofalo's Br.") 8-
16.)

───────────────

    [7] See also id. at §§ 1677(15)(A) (defining "ordinary course
of trade" as, inter alia, excluding "[s]ales disregarded under
section 1677b(b)(1)").  The "cost of production" is defined as
"an amount equal to the sum of[] (A) the cost of materials and of
fabrication or other processing of any kind employed in producing
the foreign like product, during a period which would ordinarily
permit the production of that foreign like product in the
ordinary course of business; (B) an amount for selling, general,
and administrative expenses based on actual data pertaining to
production and sales of the foreign like product by the exporter
in question; and (C) the cost of all containers and coverings of
whatever nature, and all other expenses incidental to placing the
foreign like product in condition packed ready for shipment." Id.
at § 1677b(b)(3).

The statute does not define the time period over which cost of production is to be calculated, see 19 U.S.C. at § 1677b(b), and over which a respondent's various costs must therefor be averaged.  Consequently, Commerce must select an appropriate time period for averaging the costs involved.

Commerce avers that it has "adopted a consistent and predictable approach in using [] POR-average costs – the result being a normalized, average production cost to be compared to sales prices covering the same extended period of time." I & D Mem. Cmt. 5 at 13.[8]  The Department also contends, however, that it "has articulated in several past proceedings that the use of an alternative cost averaging period may be appropriate in situations where a reliance on [its] normal annual weighted average cost method would distort the dumping analysis due to significant cost changes." Id. at 14.[9]  Commerce explains that

---

[8] (citing Color Television Receivers from the Republic of Korea, 55 Fed. Reg. 26,225, 26,228 (Dep't Commerce June 27, 1990) (final results of AD duty administrative review) (stating that use of quarterly data would cause aberrations due to short-term cost fluctuations); Gray Portland Cement and Clinker from Mexico, 58 Fed. Reg. 47,253, 47,257 (Dep't Commerce Sept. 8, 1993) (final results of AD duty administrative review) (explaining that the annual period used for calculating costs accounts for any seasonal fluctuation that may occur, because it accounts for a full operation cycle)).

[9] (noting that "[t]hese situations include high inflation and raw material cost volatility") (citing Certain Steel Concrete Reinforcing Bars from Turkey, 66 Fed. Reg. 56,274 (Dep't Commerce Nov. 7, 2001) (final results of AD duty administrative review); Brass Sheet and Strip from Netherlands, 65 Fed. Reg. 742 (Dep't

its practice in such cases is to use quarterly cost averages,

provided that the average quarterly cost changes can be linked

with changes in concurrent average quarterly sales prices. Id.

at 19.

    The Department used this alternative quarterly averaging

approach in this case.  Accordingly,[10] having found that

significant cost changes throughout the POR made POR-wide cost

averaging inappropriate, Commerce verified that quarterly

comparisons would fairly reflect actual pricing behavior by

finding "linkage within each quarter between sales prices and

---

Commerce Jan. 6, 2000) (notice of final results of AD duty
administrative review and determination not to revoke the AD duty
order)).

    [10] See Antidumping Methodologies for Proceedings that
Involve Significant Cost Changes Throughout the [POI/POR] that
May Require Using Shorter Cost Averaging Periods, 73 Fed. Reg.
26,364, 26,366 (Dep't Commerce May 9, 2008) (request for comment)
("May 2008 Notice") (explaining that, to support the use of
quarterly cost averaging periods, the record must contain
evidence of a direct linkage between quarterly costs and prices,
in addition to evidence of significant cost changes during the
POR, to assure that using quarterly periods results in analysis
that is reasonably reflective of respondents' actual pricing
behavior); Certain Welded Stainless Steel Pipes from the Republic
of Korea, Issues & Decision Mem., A-580-810, ARP 06-07 (June 22,
2009) (adopted in 74 Fed. Reg. 31,242, 31,243 (Dep't Commerce
June 30, 2009) (final results)) ("Pipes from Korea I & D Mem.")
Cmt. 1 at 6 (noting that "relying on shorter cost reporting
periods can result in an average cost that does not relate to the
sales that occurred during the same shorter period," and
explaining that, to avoid this potential distortion, the
Department inquires "whether sales during the shorter cost
averaging period could be accurately linked with the COP during
the same averaging period").

changes in [costs]." Id. at 18.[11]

Garofalo does not challenge Commerce's determination that the use of shorter-than-POR cost-averaging periods was justified in this case.[12]  Rather, Garofalo challenges the Department's use of quarterly periods as the alternative cost-averaging period. (Garofalo's Br. 9 (arguing that Commerce should have used semi-annual rather than quarterly periods).)

    *2.  Analysis*

The Department's use of quarterly comparison periods when determining whether a given sale should be excluded from the normal value calculation under Section 1677b(b)(1) in this case was a reasonable interpretation of the statute, and it was supported by substantial evidence on the record.

---

[11] (citing Certain Pasta from Italy, Mem. Re Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Results – [Garofalo], A-475-818, ARP 07-08 (July 31, 2009), Admin. R. Con. Doc. 42 [Pub. Doc. 140] ("Garofalo Prelim. Cost Calc. Mem.") [3 & Attachs. 2 & 4] (showing that quarterly costs and quarterly average sales prices moved consistently together) & Certain Pasta from Italy, Mem. Re Cost of Production and Constructed Value Calculation Adjustments for the Final Results – [Garofalo], A-475-818, ARP 07-08 (Feb. 2, 2010), Admin. R. Con. Doc. 66 [Pub. Doc. 192] ("Garofalo Final Cost Calc. Mem.") Attach. 1 (calculation showing Garofalo's average inventory period to be within an annual quarter)).

[12] (Garofalo's Br. 8 ("Garofalo believes that Commerce correctly determined that conditions during the [POR] warranted the use of shorter cost-averaging periods, rather than Commerce's consistent past practice of utilizing one POR-wide cost. Evidence on the record supports Commerce's finding that there was a significant change in costs during the POR.").)

As the Department correctly observes, see I & D Mem. Cmt. 5 at 13, the statute does not prescribe a specific time period over which cost of production must be calculated. See 19 U.S.C. § 1677b(b)(1); SeAH Steel Corp. v. United States, __ CIT __, 704 F. Supp. 2d 1353, 1363 (2010) ("The statute does not dictate the method by which Commerce may calculate costs of production, nor define the [time period over which the calculation is to be made], and Commerce is afforded considerable discretion in formulating its practices in this regard." (internal quotation and alteration marks and citation omitted)).  Because Commerce's gap-filling methodology - that POR-wide cost averaging is the preferred norm, but where significant cost changes are evident, quarterly cost averages may be used if sales can be accurately linked with the concurrent quarterly costs - is not unreasonable, it is therefore not contrary to law. See Chevron, 467 U.S. at 843 (an agency acts contrary to law if it acts based on an unreasonable construction of its statutory authority); Burlington Truck Lines, 371 U.S. at 167-68 (agencies act contrary to law if decision-making is not reasoned); SeAH Steel, __ CIT at __, 704 F. Supp. 2d at 1364 (holding that using quarterly comparisons in cases of significant cost changes comports with a reasonable interpretation of the AD statute).

In accordance with this methodology, Commerce determined that using quarterly cost averages was appropriate in this review

because significant cost changes made POR-wide averaging

distortive, and evidence on the record established a linkage

between Garofalo's quarterly costs and its quarterly pricing

behavior. I & D Mem. Cmt. 5 at 15-19.  Garofalo does not contest

that there is evidence on the record of this review of cost

changes between every quarter of the POR, see Garofalo's Br. 15

(discussing the magnitude of the quarter-to-quarter cost

increases between each quarter of the POR), or that these cost

changes can be linked to changes in its quarterly average prices,

see generally id.[13]  Accordingly, because the evidence linking

_____

[13] Instead, Garofalo argues that using quarterly cost
comparison periods is inherently distortive. See [Garofalo's]
Reply Br. in Supp. of its Mot. for J. on Agency R. Under Rule
56.2 ("Garofalo's Reply") 4 (arguing that "Commerce has
previously expressed a preference for longer cost-averaging
periods rather than shorter cost-averaging periods because, in
the longer cost-averaging periods, the cost fluctuations are
sustained for a more reasonable time than shorter cost averaging
periods" (internal quotation marks and citations omitted)) & 9
("[T]here is always a distortion created by subdividing cost
averaging periods (because of the diminished ability to smooth
out random and temporary cost fluctuations).").  At oral
argument, counsel for Garofalo reiterated that Garofalo's
objection to the use of quarterly comparison periods in this case
is purely methodological, see Transcript of Oral Argument (ECF
No. 89) ("Oral Arg. Tr.") 16 ("The administrative record is full
of [Garofalo's] briefs talking about why [using quarterly cost
averaging periods] is incorrect as a matter of theory.") & 20
("[Garofalo's] argument is that [it] did provide evidence that
[using quarterly cost averaging periods in this case is]
distortive in that it is inherently distortive when you chop it
up and do so unnecessarily.").
     The court does not agree that Commerce may never use
quarterly cost comparison periods because doing so is inherently
distortive.  As pointed out by counsel for Defendant at oral
argument, in changing markets, quarterly comparison periods may

Garofalo's cost changes in every quarter of the POR with changes in Garofalo's average quarterly prices[14] reasonably supports the conclusion that using quarterly cost comparison periods in this case yields results that are reasonably reflective of Garofalo's pricing behavior, Commerce's conclusion in this regard is supported by substantial evidence.

At oral argument, counsel for Garofalo suggested that, by resorting to quarterly comparisons without specifically asking parties for a showing of evidence countering the reasonableness of doing so, Commerce acted without providing parties with sufficient opportunity to comment prior to final agency action. See Oral Arg. Tr. 17-18. Counsel argued that Garofalo did not receive sufficient notice of the approach Commerce planned to apply in this case, and so was neither able to comment nor avail

---

capture greater accuracy than longer periods. Oral Arg. Tr. 13. In this case, Commerce confirmed the accuracy of using quarterly periods by confirming a link between quarterly changes in costs and quarterly changes in prices, I & D Mem. Cmt. 5 at 18; see May 2008 Notice, 73 Fed. Reg. at 26,366 (explaining that distortive fluctuations within shorter periods "can create uncertainty as to how accurately the average costs during the shorter period relate to the sales that occurred during that same shorter period," unless there is evidence of linkage between them), and Garofalo does not point to any evidence in the record to counter this conclusion.

[14] See I & D Mem. Cmt. 5 at 18 (citing Garofalo Prelim. Cost Calc. Mem., Admin. R. Con. Doc. 42 [Pub. Doc. 140] [3 & Attachs. 2 & 4] (showing that quarterly costs and quarterly average sales prices moved consistently together) & Garofalo Final Cost Calc. Mem., Admin. R. Con. Doc. 66 [Pub. Doc. 192] Attach. 1 (showing average inventory period calculation)).

itself of the opportunity to submit relevant evidence. Id.

The court does not agree.  The Department did not fail to provide sufficient notice of its intent to use quarterly cost averaging as the preferred alternative period of comparison where POR-wide averaging is inappropriate.  The Department's May 2008 request for comment on methodologies for dealing with situations where significant cost changes throughout the POR may require using shorter cost averaging periods repeatedly and exclusively relies on quarterly periods when providing examples of shorter-than-POR averaging periods.[15]  And in multiple cases following the May 2008 announcement, the Department used quarterly periods as the alternative cost averaging periods where

---

[15] 73 Fed. Reg. at 26,364-65 ("The Department now seeks comments from the public on the factors to consider, the tests to apply, and the thresholds to adhere to in determining whether or not shorter cost averaging periods (e.g., quarterly) are more appropriate."); id. at 26,365 (providing examples of cases where Commerce had previously resorted to shorter cost averaging periods and noting in explanatory parentheticals for each citation that the shorter periods used were quarterly periods); id. at 26,366 (discussing the procedure applied in recent proceedings where a "shorter period average cost method (e.g., quarterly cost averaging period)" was suggested); id. ("In considering whether a shorter cost averaging period reflects a more accurate measure of dumping, we also explained in [prior] proceedings that sales during the shorter averaging period must be closely linked with the COP of the shorter period.  […]  In the above-mentioned recent proceedings, in assessing whether sales can be accurately linked with the concurrent quarterly average costs, we analyzed the relationship of the cost and price trends throughout the POI/POR.").

POR-wide averaging was determined to be inappropriate.[16]  In

addition, Garofalo had adequate notice of the kind of evidence

that the Department would find relevant in determining whether or

not the use of quarterly periods is appropriate in a given

case.[17]

The court therefore concludes that Commerce's reasonable

interpretation of its statutory authority to calculate Garofalo's

costs of production – using quarterly cost averaging periods –

was reasonably applied in this case, and that the Department's

determinations in this regard were supported by substantial

---

[16] <u>Pipes from Korea I & D Mem.</u> Cmt. 1 (defending the use of quarterly comparison periods as the alternative to POR-wide averaging, and referring to the May 2008 notice as the "Quarterly Request for Comment"); <u>Stainless Steel Sheet and Strip in Coils from Mexico</u>, 73 Fed. Reg. 45,708, 45,709 (Dep't Commerce Aug. 6, 2008) (preliminary results of AD duty administrative review) (using quarterly periods as alternative to POR-wide averaging) (unchanged in final results, 74 Fed. Reg. 6,365 (Dep't Commerce Feb. 9, 2009) (final results of AD duty administrative review)); <u>Stainless Steel Plate in Coils from Belgium</u>, 73 Fed. Reg. 75,398, 75,399 (Dep't Commerce Dec. 11, 2008) (final results of AD duty administrative review) (same).

[17] <u>May 2008 Notice</u>, 73 Fed. Reg. at 26,365 ("Factors such as erratic production levels, the extent to which and how accurately monthly accruals are made, periodic maintenance, inventory valuation methods, etc. all impact the timing and accuracy of per-unit costing over short periods of time.") (citing <u>Color Television Receivers from Korea</u>, 55 Fed. Reg. at 26,228 (finding that use of quarterly data would cause aberrations due to short-term cost fluctuations)); <u>see also</u> <u>id.</u> at 26,366 & n.4 ("In certain cases, there are various factors which may affect the timing relationship between the purchase of the raw materials, the production of a product, and its subsequent sale." (noting seven such factors by way of example)).

evidence.

     *B.   Period of Sales Comparison*

      *1.   Background*

When comparing export prices to home market sales, Commerce is limited in its averaging of home market prices "to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale." 19 U.S.C. § 1677f-1(d)(2).  Thus the statute imposes a contemporaneous comparison requirement.

Commerce's regulation implementing this contemporaneous comparison requirement is known as the '90/60 window': "Normally, [Commerce] will select as the contemporaneous month the first of the following which applies: (i) The month during which the particular U.S. sale under consideration was made; (ii) If there are no sales of the foreign like product during this month, the most recent of the three months prior to the month of the U.S. sale in which there was a sale of the foreign like product; (iii) If there are no sales of the foreign like product during any of these months, the earlier of the two months following the month of the U.S. sale in which there was a sale of the foreign like product." 19 C.F.R. § 351.414(e)(2).

However, where, as here, Commerce applies its alternative cost averaging methodology, due to significantly changing costs, the Department avers that its practice is not to use the '90/60

window,' but rather to "limit[] comparisons of U.S. price to home market sales made during the same month or quarter in which the U.S. sale occurred," I & D Mem. Cmt. 5 at 19 – i.e., to modify the sales contemporaneity period to conform with the shortened cost averaging period. Id.[18]

Accordingly, because Commerce determined in this case that the changes in Garofalo's costs were significant enough, and sufficiently linked to prices, to require departure from the Department's normal annual cost averaging methodology, and instead called for the use of quarterly averaging periods, the agency contends that it was therefore "appropriate in this case to match [Garofalo's U.S.] sales only [to normal value sales] within the same quarter." I & D Mem. Cmt. 5 at 20.  The agency explains that "[c]omparing U.S. sales to [normal values] outside the quarter would result in comparisons with [normal values] that do not reflect market conditions at the time of the U.S. sale in that the [normal values] would not reflect the increasing or decreasing prices due to the significant changes in costs." Id.

Garofalo challenges Commerce's decision not to follow its normal '90/60 window' matching methodology when making sales

_____

[18] (citing, *inter alia*, Certain Porcelain-on-Steel Cookware from Mexico, 62 Fed. Reg. 42,946, 42,505-06 (Dep't Commerce Aug. 7, 1997) (final results of AD duty administrative review); Certain Welded Carbon Steel Pipe and Tube from Turkey, 61 Fed. Reg. 69,067 (Dep't Commerce Dec. 31, 1996) (notice of final results of AD duty administrative review)).

comparisons of Garofalo's home market and U.S. export sales in
this review. (Garofalo's Br. 16-19.)

    *2.   Analysis*

Commerce's interpretation of its authority under 19 U.S.C.
§ 1677f-1(d)(2) and 19 C.F.R. § 351.414(e)(2) is reasonable, and
the decisions made in the exercise of that authority in this
review were supported by substantial evidence.

The Department's regulation defines "contemporaneous month"
in order to clarify the phrase "the calendar month that
corresponds most closely to the calendar month of the individual
export sale" in Section 1677f-1(d)(2) of the AD statute.  The
regulation, however, explicitly states that it will apply under
"normal" circumstances. 19 C.F.R. § 351.414(e)(2).  As discussed
above, in this review, Commerce determined – and Garofalo does
not contest – that significant changes in Garofalo's costs of
production during the POR removed this case from the realm of
"normal" circumstances. I & D Mem. Cmt. 5. (Garofalo's Br. 8.)

The Department explains that, "[w]hen significant cost
changes have occurred during the POR, these same conditions are
accompanied by changes in prices," I & D Mem. Cmt. 5 at 20, and
that, in this situation, "to lessen the margin distortions caused
by changes in sales price which result from significantly
changing costs[,] . . . it is appropriate to compare U.S. sales
with contemporaneous [normal values] which were made in the

ordinary course of trade as established in the sales-below-cost test." Id.  This is a reasonable explanation for Commerce's decision to limit comparison of Garofalo's U.S. and home market sales to contemporary quarterly periods in this review.  The agency's reasoning in this regard is therefore neither contrary to statute nor to the Department's regulation.

Garofalo appears to argue that, even if Commerce's explanation is a reasonable interpretation of its statutory authority, its application in this case was not supported by substantial evidence because the cost changes, although significant across semi-annual periods, were not sufficiently significant across all quarters to prevent a fair comparison. (See Garofalo's Reply 13 (arguing that limiting price comparisons to quarters "denied Garofalo contemporaneous home market matches" because cost changes were not sufficiently significant across quarters to prevent fair comparison).)

But the Department concluded in this review that "record evidence show[ed] that Garofalo's [costs] increased in each quarter of the POR for all wheat codes except for one wheat code in one quarter, and not just at the six month mark as Garofalo claims." I & D Mem. Cmt. 5 at 19.  Moreover, as discussed above, record evidence supported the conclusion that these quarterly changes in market conditions resulted in concurrent quarterly changes in Garofalo's prices. Id. at 18.  In line with the

Department's reasonable methodology, therefore, limiting sales comparisons to contemporaneous annual quarters in this case appropriately "lessen[s] the margin distortions caused by changes in sales price which result from significantly changing costs." <u>Id.</u> at 20.

Garofalo argues that the cost change between the first and second quarters (a change of "under 25 percent" (Garofalo's Br. 15)), and that between the third and fourth quarters (a change of "about [ ] one percent" for four of five models and "under five percent" for the remaining model (<u>id.</u>)), should not have been interpreted by Commerce as significant. (<u>Id.</u>)

The question before the court in this respect is whether a reasonable mind might accept the evidence as adequate to support Commerce's conclusion. <u>Consol. Edison</u>, 305 U.S. at 229.  It is Commerce's duty to weigh the evidence on the record before it and reach a reasonable decision.  Where, as here, the overall cost change exceeded twenty-five percent over the course of the POR, and quarterly changes in costs were reflected in concurrent quarterly prices, a reasonable mind could accept the evidence of the cost changes between every quarter as adequate to support the conclusion that these cost changes were significant.  It follows that Commerce's decision is supported by substantial evidence on the record of this review.

The court therefore concludes that Commerce's decision to

limit comparison of Garofalo's U.S. and home market sales to contemporaneous annual quarters was neither contrary to law nor unsupported by substantial evidence.

## II.  Petitioner Plaintiffs' Challenges

As noted above, the Petitioner Plaintiffs challenge Commerce's intention to employ new model match criteria in future reviews of this AD duty order.  These Plaintiffs also challenge the Department's acceptance, in this review, of company-specific model match criteria for each mandatory respondent – Garofalo and P.A.M. S.p.A. ("PAM"). (Domestic Industry's Rule 56.2 Br. in Supp. of its Mot. for J. on Agency R. ("Pet'r Pls.' Br.").)

### A.  *New Model Match Criteria to Apply in Future Reviews*

#### 1.  *Background*

When comparing export and home market sales in the course of conducting its dumping analysis, Commerce must identify the foreign like product that will serve as the basis for comparison. See 19 U.S.C. § 1677b(a)(1)(B); id. at § 1677(16). See also Faq Kugelfischer Georg Schafer Ag v. United States, 332 F.3d 1370, 1372 (Fed. Cir. 2003) ("'Foreign like product' is the merchandise offered for sale in the producing and exporting country that is most like, and may be reasonably compared to, the allegedly dumped subject merchandise here in the United States." (citing 19 U.S.C. § 1677(16))).

When respondents' subject merchandise consists of two or

more significantly diverse product models, Commerce will match
U.S. and home-market products using model match criteria to
assure accurate price comparisons within but not across relevant
product categories. See, e.g., SKF USA, Inc. v. United States,
537 F.3d 1373, 1379 (Fed. Cir. 2008) ("[A] methodology [for model
matching in the determination of "foreign like product" under
Section 1677(16)] yields more accurate results [when] it matches
the most similar product rather than merely pooling several
models that matched as to [a number of] characteristics but could
vary significantly in price or cost, due to differences in
materials for certain components or added features."); JTEKT
Corp. v. United States, __ CIT __, 717 F. Supp. 2d 1322, 1329 &
n.4 (2010) (affirming as "a reasonable construction of the
antidumping statute" a model match methodology which sought to
"reflect[] more accurately the intent of 19 U.S.C. § 1677(16),
including the statute's preference for identifying the foreign
like product by selecting the single most-similar product"
(internal quotation and alteration marks and citation omitted)).

In this review and in some previous administrative
proceedings under this AD duty order, Commerce has accepted
respondent-specific claims for model match criteria. I & D Mem.
Cmt. 3 at 10 & Cmt. 6 at 21.  In the administrative review
immediately preceding the review at issue in this case, however,
Commerce recognized "the need [for its model match criteria] to

be consistent" and endeavored to "articulate a clear and
comprehensive standard based on industry-wide commercial
standards." Certain Pasta from Italy, Issues & Decision Mem., A-
475-818, ARP 06-07 (Dec. 4, 2008) (incorporated in Certain Pasta
from Italy, 73 Fed. Reg. 75,400, 75,401 (Dep't Commerce Dec. 11,
2008) (notice of final results of the eleventh administrative
review and partial rescission review)) ("11th I & D Mem.") Cmt.
9.  To that end, "in order to allow interested parties to comment
on this general issue," id., Commerce proposed to solicit
comments in the course of the next administrative review (i.e.,
the review at issue in this case), and stated that "[b]ased on
such comments, [the Department] will make any necessary changes
and/or clarifications to the model match criteria for pasta to
apply to all future respondents." Id.

        As promised, in the instant review, Commerce solicited and
received comments from interested parties regarding the physical
characteristics of, and the industry standards, measurement of
material cost differences, and definitions of commercial
significance applicable to the subject merchandise, with the goal
of developing objective model match criteria to apply to all
respondents in future reviews of this AD duty order. Certain
Pasta from Italy, 74 Fed. Reg. 39,285, 39,286 (Dep't Commerce,
Aug. 6, 2009) (notice of preliminary results of twelfth AD duty
administrative review). "Based on [the agency's] analysis of

these comments, and [its] review of prior determinations," id.,
Commerce proposed, in the Preliminary Results for the instant
review, new model match criteria, "[to] be applicable in the
2008-2009 and subsequent administrative reviews of pasta from
Italy." Id.; see Certain Pasta from Italy, Prelim. Model Match
Clarification on Pasta Wheat Code Classifications, A-475-818, ARP
07-08 (July 31, 2009), Admin. R. Pub. Doc. 138 ("Prelim. Model
Match Mem.").

In its Final Results for the instant review, Commerce
"concluded that no changes from the [new model match
criteria] proposed in the preliminary results [were] warranted."
Final Results, 75 Fed. Reg. at 6,353. Accordingly, Commerce
announced that, in future reviews, the agency intends to apply to
all respondents the objective, industry-wide model match criteria
laid out in the Preliminary Model Match Memorandum. See Final
Results, 75 Fed. Reg. at 6,353; Prelim. Model Match Mem., Admin
R. Pub. Doc. 138 at 8-9.

The Petitioner Plaintiffs challenge the legality of, and the
evidentiary support for, this proposed new methodology. (See
Pet'r Pls.' Br. 25-40.)

    2.  Analysis

Because Commerce's stated intention to apply new model match
criteria in future reviews does not constitute final agency
action, and because the parties have presented no evidence that

withholding court consideration of this matter – until such time
as final agency action has effected its legal consequences on the
rights and obligations of interested parties – would result in
undue hardship to the parties, Commerce's proposed new model
match criteria are not ripe for judicial review. See Tokyo Kikai
Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1362 (Fed. Cir.
2008) ("In determining whether an appeal from an administrative
determination is ripe for judicial review, [courts] look to (1)
'the fitness of the issue for judicial decision' and (2) 'the
hardship to the parties of withholding court consideration.'"
(quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967))); id.
at 1364 ("Because Commerce's stated intention . . . is not final,
and thus not fit for judicial decision, and because withholding
court consideration of the issue presents no undue hardship to
the parties, we conclude that it is not ripe for judicial
review."); Sioux Honey Ass'n v. United States, __ CIT __, 722
F. Supp. 2d 1342, 1361-62 (2010) ("A mere intention to act . . .,
absent extraordinary circumstances calling for emergency
equitable relief (not alleged here), is not agency action ripe
for judicial review." (citing U.S. Ass'n of Imps. of Textiles &
Apparel v. U.S. Dep't of Commerce, 413 F.3d 1344, 1349-50 (Fed.
Cir. 2005))).

   B.   *Respondent-Specific Model Match Criteria in This Review*

        1.   *Background*

   Notwithstanding the Department's intent to apply new model

match criteria in all *future* reviews, in this review Commerce

continued to apply the old model match criteria, and accepted

respondent-specific wheat code categories from both Garofalo and

PAM. See <u>I & D Mem.</u> Cmts. 3 & 6.[19]

   Specifically, for both PAM and Garofalo, Commerce accepted

company-specific distinctions within subject merchandise based on

whether the finished pasta was made primarily with standard or

'superior'/'excellent' semolina, where physical differences in

the semolina primarily used were determined to be commercially

significant. <u>Id.</u>  For Garofalo, Commerce based its decision "on

the evidence placed on the record by Garofalo with respect to

cost differences attributable to significant differences in

physical characteristics (i.e., gluten (protein) content) for

'excellent' quality semolina." <u>I & D Mem.</u> Cmt. 3 at 11.  For PAM,

Commerce based its decision "on the evidence placed on the record

by PAM with respect to cost differences attributable to

_____

     [19] Specifically, the Department's 'Field Number 3.2'
provided the following categories for respondents' reporting of
the wheat types primarily used to produce their products: 1 = 100
percent durum semolina; 2 = 100 percent whole wheat; 3 - n =
"specify additional categories as required." <u>E.g.</u>, <u>Certain Pasta
from Italy</u>,[Garofalo] Section B Questionnaire Resp., A-475-818,
ARP 07-08 (Nov. 24, 2008), Admin. R. Con. Doc. 6 [Pub. Doc. 52]
("<u>Garofalo Sec. B Resp.</u>") at B-6.

significant differences in physical characteristics (i.e., ash
and gluten (protein) content) for 'semolina superior' and on the
sales price differences in finished pasta that resulted from
PAM's use of semolina superior." Id. at Cmt. 6 at 22.

The Petitioner Plaintiffs object, on both legal and
evidentiary grounds, to Commerce's decision to accept PAM and
Garofalo's company-specific modifications to the model match
criteria in this review.  These Plaintiffs argue that Commerce's
decisions in this regard were contrary to law because (a) the AD
statute requires that "foreign like product" determinations be
based on objective industry-wide criteria, whereas Commerce
applied different criteria for each respondent (Pet'r Pls.' Br.
12); and (b) the AD statute requires that "foreign like product"
determinations be based on the physical characteristics of
finished products, rather than the physical characteristics of
the inputs relied on in this case (id. at 10-14).  The Petitioner
Plaintiffs also argue that (c) in any case, the Department's
conclusions regarding the commercial significance of physical
differences in PAM and Garofalo's inputs and/or finished products
were not supported with substantial evidence on the record of
this review (see id.).

2. *Analysis*

a. *Respondent-Specific Model Match Modifications*

Commerce defends its acceptance of respondent-specific model

match criteria with reasoning dating back to the investigation of

sales at LTFV underlying this AD duty order. I & D Mem. Cmt. 3 at

10-11 & Cmt. 6 at 21-22 (quoting Certain Pasta from Italy,

61 Fed. Reg. 30,326, 30,346 (Dep't Commerce June 14, 1996)

(notice of final determination of sales at LTFV) ("LTFV Final

Results")).

In the LTFV Final Results, Commerce interpreted Section

1677(16) to mean that "[f]oreign like products . . . are specific

to each responding company." 61 Fed. Reg. at 30,346 (quoting

19 U.S.C. § 1677(16)[20]).  This interpretation of Section 1677(16)

has been previously upheld by this Court, New World Pasta Co. v.

United States, 28 CIT 290, 316 F. Supp. 2d 1338, 1340 (2004)

(denying a challenge to "Commerce's decision to add a

[particular] product-matching criterion [] in defining the

---

[20] 19 U.S.C. § 1677(16) ("The term 'foreign like product'
means merchandise in the first of the following categories in
respect of which a determination for the purposes of part II of
this subtitle can be satisfactorily made: (A) The subject
merchandise and other merchandise which is identical in physical
characteristics with, and was *produced* in the same country *by the
same person* as, that merchandise. (B) Merchandise – (i) *produced*
in the same country and *by the same person* as the subject
merchandise, (ii) like that merchandise in component material or
materials and in the purposes for which used, and (iii)
approximately equal in commercial value to that merchandise. (C)
Merchandise – (i) *produced* in the same country and *by the same
person* and of the same general class or kind as the subject
merchandise, (ii) like that merchandise in the purposes for which
used, and (iii) which the administering authority determines may
reasonably be compared with that merchandise." (emphasis added by
the court)).

'foreign like product' for [a certain respondent], but not for other companies in the same review" (footnote omitted))[21], and the court sees no reason to revisit this legal issue.[22]

> b.   *Matching Based on Physical Characteristics of Inputs*

The Department also defends its acceptance of company-specific model match criteria based on differences in the physical characteristics of the type of semolina used to make the final pasta product.  In doing so, Commerce again relies on reasoning dating back to the LTFV Final Results.  I & D Mem. Cmt. 3 at 10-11 & Cmt. 6 at 21-22 (quoting LTFV Final Results, 61 Fed. Reg. at 30,346).  In that proceeding, "respondents [who] reported wheat quality as a physical characteristic [that] would result in more appropriate product matches . . . established that different wheat (i.e. semolina) qualities existed and that these were measured by ash and gluten content." LTFV Final Results, 61 Fed. Reg. at 30,346.  Commerce "verified that [these] physical differences exist," id., and "found these quality differences reflected in semolina costs and pasta prices." Id.  The

---

[21] See id. at 1356-57 ("The Court's review of the applicable statutes and regulations does not reveal any reason why Commerce should be barred from using a product-matching criterion solely in relation to the one company under review to which it has application.").

[22] Counsel for Garofalo conceded at oral argument that New World Pasta accurately resolved this issue. Oral Arg. Tr. 24-25.

Department determined these physical differences in semolina type to be "commercially significant and an appropriate criterion for product matching." Id.

In this case, the Department applied Subsection (C) of Section 1677(16) in defining 'foreign like product' for both PAM and Garofalo. I & D Mem. Cmt. 3 at 11 & Cmt. 6 at 22.  This Subsection defines 'foreign like product' as merchandise that is "(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise, (ii) like that merchandise in the purposes for which used, and (iii) which the administering authority determines may reasonably be compared with that merchandise." 19 U.S.C. § 1677(16)(C). There is nothing in this language to render the Department's reading of it – that products may be categorized into separate models on the basis of significant physical differences in the types of materials from which the finished subject merchandise is produced – unreasonable.  To the contrary, the statute's emphasis, in the preceding Subsection (B), on likeness of merchandise in terms of "component material or materials," 19 U.S.C. § 1677(16)(B)(ii), supports the reasonableness of the Department's interpretation. See also SKF, 537 F.3d at 1379 (affirming model match methodology that sought to separate out models that "could vary significantly in price or cost, *due to differences in materials for certain components* or added

features" (emphasis added)).

Moreover, the final criterion of Subsection (C) – that the relevant home market comparison merchandise be that "which [Commerce] determines may reasonably be compared with [the U.S.] merchandise," 19 U.S.C. § 1677(16)(C)(iii) – appears to provide the Department with wide latitude in defining 'foreign like products' under this Subsection. See, e.g., SKF USA Inc. v. United States, 263 F.3d 1369, 1381 (Fed. Cir. 2001) ("Commerce certainly has . . . considerable discretion in defining 'foreign like product' . . . ."); AL Tech Specialty Steel Corp. v. United States, 20 CIT 1344, 1349, 947 F. Supp. 510, 516 (1996) ("This Court has frequently acknowledged Commerce's broad discretion in devising a methodology for determining what constitutes similar merchandise pursuant to 19 U.S.C. § 1677(16)(1988)[23]." (citations omitted)).

Accordingly, the court concludes that the Department's interpretation of Subsection 1677(16)(C)[24] to allow for separate

---

[23] The term 'foreign like product' appeared in the statute as 'such or similar merchandise' prior to the statute's amendment by the Uruguay Round Agreements Act. See Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1383-84 & n.8 (Fed. Cir. 2001) (noting the change in language while relying on earlier judicial interpretation of 'similar merchandise' to interpret 'foreign like product' within current statutory language).

[24] The court notes that, although Commerce explicitly stated that it relied on Subsection (C) in this case, it provided no explanation for why Subsections (A) or (B) could not be used in this case, see 19 U.S.C. § 1677(16) (defining 'foreign like

product categorization on the basis of significant physical differences in the types of semolina used to produce respondents' finished pasta is reasonable, and is therefore not contrary to law. See Chevron, 467 U.S. at 843; Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1381 (Fed. Cir. 2008) ("The court must defer to Commerce's permissible construction of the statute and permissible choice of matching methodology." (citing Koyo Seiko Co. v. United States, 66 F.3d 1204, 1210-11 (Fed. Cir. 1995) (citing Chevron, 467 U.S. at 843 (1984))); SKF, 537 F.3d at 1379 ("[The AD] statute 'is silent with respect to the methodology that Commerce must use to match a U.S. product with a suitable home-market product[,]' . . . [and] we have previously held that Congress has granted Commerce considerable discretion to fashion the methodology used to determine what constitutes 'foreign like product' under the statute." (quoting Koyo Seiko, 66 F.3d at 1209 and citing Pesquera, 266 F.3d at 1384))).

---

product' under the first of Subsections (A), (B) or (C) in respect of which a determination can satisfactorily be made). At oral argument, counsel for Garofalo argued that Subsection (A) should have been used in this case. Oral Arg. Tr. 26.

The Department, however, acted reasonably regardless of which subsection controls here. By linking the physical differences verified in respondents' different semolina types to correlative physical and price differences in respondents' finished pasta, I & D Mem. Cmt. 3 at 11 & Cmt. 6 at 22; see also Prelim. Model Match Mem., Admin. R. Pub. Doc. 138 at 7, Commerce ensured that categorizing different product models based on physical differences in the types of semolina used would result in comparisons that match only physically and commercially identical pasta. See 19 U.S.C. § 1677(16)(A).

       *c.   Substantial Evidence*

Commerce has established a practice of matching U.S. merchandise to relevant 'foreign like products' by discerning significant differences, determined on a case-by-case basis, in the physical characteristics of finished products or their material components. See, e.g., New World Pasta, 28 CIT at __, 316 F. Supp. 2d at 1354; Pesquera Mares Australes Ltda. v. United States, 24 CIT 443, 447 (2000), aff'd, 266 F.3d 1372 (Fed. Cir. 2001).  The Department's decisions regarding whether physical differences are sufficiently significant or meaningful to warrant the separation of products into different categories for model matching purposes is reviewed by the court to determine whether they are supported by substantial evidence. See Pesquera, 266 F.3d at 1384.

In this review, Commerce based its conclusions that "substantial evidence supports finding that wheat codes reported by [PAM and Garofalo] result in reasonable comparisons," I & D Mem., Cmt. 3 at 11 (relying on 19 U.S.C. § 1677(16)(C)) & Cmt. 6 at 22 (same), on the following factual determinations with respect to the products of each respondent: "1) that [Garofalo and PAM's respective 'excellent' and 'superior' semolina] has a higher protein (gluten) content than other types of semolina used to produce pasta; 2) [Garofalo and PAM's respective 'excellent'

and 'superior' semolina] is more expensive than other types of
semolina used to produce pasta; and 3) pasta produced using
[Garofalo and PAM's respective 'excellent' and 'superior']
quality semolina is priced separately from, and higher than,
[their respective] pasta[s] produced from other types of
semolina." Id.  The court concludes that, contrary to the
Petitioner Plaintiffs' contentions, Commerce has adequately
pointed to "such relevant evidence [on the record of this review]
as a reasonable mind might accept as adequate to support [each of
the Department's] conclusion[s]"[25] in this regard.

First, there is substantial evidence regarding the physical
differences between Garofalo and PAM's respective 'excellent' or
'superior' and their respective standard semolina.  With respect
to Garofalo, in the absence of evidence of changed circumstances,
the Department appropriately relied on its prior evidentiary
determination that the semolina types used by Garofalo are
readily distinguishable by differences in their physical
characteristics, such as gluten content.[26]  Although interested

---

[25] Consol. Edison, 305 U.S. at 229.

[26] See I & D Mem. Cmt. 3 at 11 (noting that, in the
Preliminary Results, the Department "found that there were no
differences . . . with respect to Garofalo's model match" between
this and prior reviews); Certain Pasta from Italy, Issues &
Decision Mem., A-475-818, ARP 00-01 (Feb. 3, 2003) (adopted in
Certain Pasta from Italy, 68 Fed. Reg. 6,882, 6,883 (Dep't
Commerce Feb. 11, 2003) (notice of final results of AD duty
administrative review and determination not to revoke in part))

parties were provided with opportunity to argue that

circumstances have so changed that reliance on previous

evidentiary determinations with respect to Garofalo was no longer

_____

("5th Rev. I & D Mem.") Cmt. 8 at 12 (accepting Garofalo's
separate model match categorization for pasta made with superior
and standard quality semolina because "[t]he additional expense
of an input in the creation of a unique product does justify a
separate classification," and"[t]here [was] adequate information
on th[e] record which attest[ed] to the quality of the different
types of semolina used"); Certain Pasta from Italy, Issues &
Decision Mem., A-475-818, ARP 01-02 (Feb. 3, 2004) (adopted in
Certain Pasta from Italy, 69 Fed. Reg. 6,255, 6,256 (Dep't
Commerce Feb. 10, 2004) (notice of final results of the sixth
administrative review of the AD duty order and determination not
to revoke in part)) ("6th Rev. I & D Mem.") Cmt. 26 at 37
(accepting Garofalo's separate model match categorization for
pasta made with superior and standard quality semolina, based on
"the wheat [that] makes up the largest percentage of the blended
wheat type" used to make a particular finished pasta product, and
noting that "the most important factor in this determination
[was] the physical differences between the types of wheat").

     While Commerce specifically points to the seventh review, I
& D Mem. Cmt. 3 at 11, and Garofalo was not a respondent in the
seventh review, see Certain Pasta from Italy, 70 Fed. Reg. 6,832,
6,832 (Dep't Commerce Feb. 9, 2005) (notice of final results of
the seventh administrative review of the AD duty order and
determination to revoke in part) ("7th Rev. Final Results")
(noting that review of, inter alia, Garofalo was rescinded), it
is reasonable to conclude that Commerce was relying on a lack of
evidence controverting its evidentiary determinations regarding
Garofalo's wheat types in those prior reviews where such
determinations were actually made. See I & D Mem., Cmt. 3 at 11
(citing sixth review when discussing the Department's prior
application of its standard allowing for company-specific
separate treatment of semolina inputs with significant physical
and price differences); id. (citing Certain Pasta from Italy,
[Garofalo's] Rebuttal Comments on Wheat Code Classifications, A-
475-818, ARP 07-08 (Mar. 10, 2009), Admin. R. Pub. Doc. 73
("Garofalo's Rebuttal Cmts.") 3 (relying on 6th Rev. I & D Mem.
Cmt. 26 at 37 (noting that "in the absence of new facts or new
arguments, the Department does not revisit previous
determinations," and relying on 5th Rev. I & D Mem. Cmt. 8 at
12))).

reasonable, the Petitioner Plaintiffs do not point to any such evidence.  Accordingly, the Department reasonably relied on the continued accuracy of its prior evidentiary determinations that the separate wheat types reported by Garofalo significantly differed in physical characteristics such as gluten content. See Pakfood Pub. Co. v. United States, __ CIT __, 753 F. Supp. 2d 1347-48 (2011) (holding that it is reasonable for Commerce to rely on relevant evidentiary findings from prior administrative segments, provided that interested parties are given the opportunity to challenge their continued accuracy, and that parties have not pointed to evidence suggesting that such challenge should have been successful); 6th Rev. I & D Mem. Cmt. 26 at 37 (noting that "in the absence of new facts or new arguments, the Department does not revisit previous determinations").

With respect to PAM, the Department adequately supported its determination that PAM's superior semolina physically differs from its standard semolina, in terms of gluten content, with relevant evidence on the record of this review. I & D Mem. Cmt. 6 at 22 (citing Certain Pasta from Italy, PAM's Response to Section D and Sections A-C Second Supplemental Questionnaires, A-475-818, ARP 07-08 (May 4, 2009), Admin. R. Con. Doc. 31 [Pub. Doc. 103] ("PAM's A-D Supp. Resp.") 10 (providing gluten values for types of semolina used by PAM, ranging from [[    ]]% for normal

semolina to [[    ]]% for superior semolina (citing <u>Certain Pasta</u> <u>from Italy</u>, PAM's Comments on Wheat Codes, A-475-811, ARP 07-08 (Feb. 9, 2009), Admin. R. Con. Doc. 14 ("<u>PAM Wheat Comments</u>") Ex. 1 (PAM Proprietary Semolina Standards) at 8))).[27]

Second, the Department also provides sufficient evidentiary support for its conclusions that Garofalo and PAM generally paid higher prices for their respective superior semolina than those for their respective standard semolina. <u>See</u> <u>I & D Mem.</u> Cmt. 3 at 11 (citing <u>Certain Pasta from Italy</u>, [Garofalo's] Comments on Wheat Code Classifications, A-475-818, ARP 07-08 (Feb. 23, 2009), Admin. R. Con. Doc. 16 [Pub. Doc. 68] ("<u>Garofalo's Feb. 23</u> <u>Cmts.</u>") 5 (relying on <u>id.</u> at Ex. 8 (contracts for Garofalo's purchase of standard and excellent quality semolina, showing a

---

[27] Unlike Garofalo, PAM was previously denied the use of a separate wheat code for pasta made primarily from its superior semolina. <u>Certain Pasta from Italy</u>, Issues & Decision Mem., A-475-818, ARP 02-03 (Feb. 2, 2005) (adopted in <u>7th Rev. Final</u> <u>Results</u>, 70 Fed. Reg. at 6,833) ("<u>7th Rev. I & D Mem.</u>") Cmt. 21 at 24 (reasoning that additional wheat codes are not warranted absent evidence of accompanying physical differences in the types of semolina primarily used).  In this review, however, the Department found that PAM presented sufficient evidence of such physical differences, and concluded that there were significant differences in this regard between the evidence presented in this segment and that before the agency in the seventh review. <u>I & D</u> <u>Mem.</u> Cmt. 6 at 22 (citing, *inter alia*, <u>PAM's A-D Supp. Resp.</u>, Admin. R. Con. Doc. 31, at 10 & <u>Certain Pasta from Italy</u>, PAM Request to Augment Record, A-475-818, ARP 07-08 (Aug. 14, 2009), Admin. R. Con. Doc. 45 [Pub. Doc. 146], Ex. 1 (proprietary version of the preliminary results calculation memorandum for PAM from the seventh review, containing PAM's semolina gluten content from that review)).

price of [[          28]] for excellent quality semolina

contracted for on [[          ]], and a price of [[        ]]

for normal semolina contracted for on [[          ]])))[29] &

Cmt. 6 at 22 (citing <u>Certain Pasta from Italy</u>, PAM's Section B-D

Questionnaire Response, A-475-818, ARP 07-08 (Dec. 10, 2008),

Admin. R. Con. Doc. 9 [Pub. Doc. 55] ("<u>PAM's B-D Resp.</u>") 77 & Ex.

5 (listing types and prices for semolina purchased by PAM)).

    Finally, the Department provides sufficient evidentiary

support for its conclusions that "[Garofalo and PAM's] pasta

produced using [their respective 'excellent' and 'superior']

---

[28] Garofalo notes that, while "[b]oth contracts mistakenly refer to the unit price as 'KG'[,] [i]n fact . . . the contract prices are in Euros per MT." <u>Garofalo's Feb. 23 Cmts.</u>, Admin. R. Con. Doc. 16 [Pub. Doc. 68] at 5 n.3.

[29] <u>See also</u> <u>Certain Pasta from Italy</u>, Garofalo's Supp. Cost Quest. Resp., A-475-818, ARP 07-08 (May 14, 2009), Admin R. Con. Doc. 33 [Pub. Doc. 109] ("<u>Garofalo's May 14 Supp. Resp.</u>") Ex. SD-24 (Garofalo's weighted average semolina cost by wheat code, [[
                                                      ]]).  While
the Petitioner Plaintiffs interpret this evidence to show "that Garofalo's reported costs for 'excellent' quality semolina (product code '1') were [[     ]] lower than its reported costs for 'standard' semolina" (Dom. Pls.' Br. 38 (citing <u>Garofalo's May 14 Supp. Resp.</u>, Admin R. Con. Doc. 33 [Pub. Doc. 109] Ex. SD-24)), the evidence is clearly to the contrary.  <u>See</u> <u>Garofalo's May 14 Supp. Resp.</u>, Admin R. Con. Doc. 33 [Pub. Doc. 109] Ex. SD-24; <u>Garofalo Sec. B Resp.</u>, Admin. R. Con. Doc. 6 [Pub. Doc. 52] at B-6 (explaining that Garofalo's wheat code 1 applies to "pasta made with [[

     ]]," and that Garofalo's wheat code 4 applies to "pasta made with [[

          ]]").

quality semolina is priced separately from, and higher than,

[their respective] pasta[s] produced from other types of

semolina." I & D Mem. Cmt. 3 at 11 & Cmt. 6 at 22. See id. at

Cmt. 3 at 11 (citing Garofalo's Feb. 23 Cmts., Admin. R. Con.

Doc. 16 [Pub. Doc. 68] at 5 (arguing that Garofalo's "products

made with superior semolina [command] a significant price

premium" over Garofalo's products made with standard semolina

(citing id. at Ex. 9 (price lists for Garofalo's [[

     ]], showing a price of [[

          ]] and a price of [[                              30

               ]]))) & Cmt. 6 at 22

(citing PAM's B-D Resp., Admin. R. Con. Doc. 9 [Pub. Doc. 55] &

PAM's A-D Supp. Resp., Admin. R. Con. Doc. 31 [Pub. Doc. 103]).[31]

_____

[30] In response to the court's concern that this price is
hard to read in the document cited, counsel for Defendant pointed
to Garofalo's Feb. 23 Cmts., Admin. R. Con. Doc. 16 [Pub. Doc.
68] at Ex. 10 (graph showing prices for pasta made with standard
semolina within the range of [[          ]] as of February
2008), to verify this number. Oral Arg. Tr. 34-36.

[31] Although Commerce does not pin cite either of these
citations, counsel for Defendant pointed to PAM's A-D Supp.
Resp., Admin. R. Con. Doc. 31 [Pub. Doc. 103] at 32-33 (replying
to a request for price lists that "PAM has given examples of its
price lists in A QR Exh. 4 at PDF-122-24 and §AC Supp. QR Exh. 8
at PDF-147ff," and arguing that "[t]he Department, of course, has
PAM's sales databases, and so it can readily confirm that there
is a very significant difference in price between WHEAT=1 and
WHEAT=2 pasta in the home market, as tabulated at PAM's wheat
comments (February 9, 2009) at 3 Table 1") & Certain Pasta from
Italy, Calculation Mem. For PAM, A-475-818, ARP 07-08 (Mar. 3,
2010), Admin. R. Con. Doc. 72 [Pub. Doc. 198] Attach. 2 (sample
of PAM's weighted average net prices). Oral Arg. Tr. 36-37.

Accordingly, because substantial evidence supports the Department's conclusions that Garofalo and PAM's respective separate wheat codes apply to pasta made primarily from semolina of significantly different physical characteristics and price, resulting in a price difference in the respective finished products, the court agrees with the Department that "substantial evidence supports [Commerce's] finding that wheat codes reported by [Garofalo and PAM] result in reasonable comparisons." I & D Mem. Cmt. 3 at 11 & Cmt. 6 at 22 (relying on 19 U.S.C. § 1677(16)(C)).

## CONCLUSION

For all of the foregoing reasons, the Department's Final Results are AFFIRMED.   Judgment will be entered accordingly.

It is **SO ORDERED**.

                                        /s/ Donald C. Pogue
                                        Donald C. Pogue, Chief Judge

Dated:     June 8, 2011
           New York, N.Y.

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌─────────────────────────────────────────────┐
│ PASTIFICIO LUCIO GAROFALO, S.P.A.,           │
│                                              │
│              Plaintiff,                      │
│                                              │
│              - v -                           │
│                                              │
│ THE UNITED STATES,                           │
│                                              │
│              Defendant,                      │
│                                              │
│              - and -                         │
│                                              │
│ AMERICAN ITALIAN PASTA COMPANY,              │
│ DAKOTA GROWERS PASTA COMPANY,                │
│ and NEW WORLD PASTA COMPANY,                 │
│                                              │
│              Defendant-Intervenors.          │
└─────────────────────────────────────────────┘
```

Before: Pogue, Chief Judge

Consol. Court No. 10-00095

<u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that the United States Department of Commerce's Final Results in <u>Certain Pasta from Italy</u>, 75 Fed. Reg. 6,352 (Dep't Commerce Feb. 9, 2010) (final results of the twelfth administrative review) are AFFIRMED.

   /s/ Donald C. Pogue
Donald C. Pogue, Chief Judge

Dated:    June 8, 2011
          New York, N.Y.